742 So.2d 1270 (1999)
B.J.N.
v.
P.D.
2980660.
Court of Civil Appeals of Alabama.
September 10, 1999.
*1271 James R. Johnson, Carbon Hill, for appellant.
Submitted on appellant's brief only.
BEATTY, Retired Justice.
This is a child-custody case. After a hearing, the trial court awarded custody to the father, subject to the mother's visitation rights, and ordered the mother to pay $150 per month in child support. The mother appeals. We reverse and remand.
On September 10, 1998, the father filed a petition seeking temporary and permanent custody, care, and control of his three-year-old child. The petition alleged that on September 9, 1998, the child's mother had left the minor child alone with his 13-year-old stepsister, and that the mother had left the child alone before. The petition further alleged that "[the father] is of the opinion that [the mother] may have relapsed into the use of marijuana and/or other drugs." That same date, the trial court entered an ex parte order awarding the father temporary custody of the child pending a final hearing. Thereafter, the mother filed an answer and a counterclaim, denying the allegations in the father's petition. Following the final hearing on the petition, the trial court entered an order that provided, in pertinent part, as follows:
"This cause now comes before the Court for final order upon completion of the home studies. The court having received the same as well as reviewed the home study of both the [father] and the [mother] and having received a report from the court referral officer that the [father] has been compliant with the color code [drug testing] requirements placed on him but that the [mother] has not been compliant with the color code requirements placed on her, and in consideration of the same as well as all the evidence in this cause,
"IT IS ORDERED, ADJUDGED, AND DECREED as follows:
"1. That the care, custody, and control of the minor child in this cause ... be and the same is hereby vested in the [father], subject to the right of the [mother] to have access to and visitation with the said minor child...."
The trial court also ordered the mother to pay $150 per month child support.
The record discloses the following pertinent facts. The parties are the parents of a child, who was born in August 1995. The parents were never married. In 1996, after being convicted of burglary, the father was incarcerated. The father attributed his conviction to an addiction to alcohol and drugs. For a brief time in 1996, a paternal aunt had temporary custody of the child because of allegations that the mother had been using marijuana. The court subsequently returned custody to the mother and ordered the mother to participate in the "color code" drug-screening program.[1]
*1272 The mother was employed, and with her earnings and help from her family she purchased a three-bedroom mobile home, in which she, her 13-year-old daughter from another relationship, and the minor child lived. This mobile home is located a matter of yards from the homes of the child's maternal aunt, maternal grandmother, and several other relatives. The stepsister was a constant companion to the minor child, and she frequently cared for him when their mother was away. The father admitted during the hearing that the minor child was always well cared for and well dressed and that the child's stepsister had "practically raised [him]."
The mother testified that she could barely provide her family food, clothing, and shelter on her income alone and that she struggled financially. It was often impossible for her to purchase things that the family did not absolutely require, and the mother testified that some of her home furnishings had been repossessed because she could not pay for them. The mother testified that she had never received child support from her daughter's father and that she had received only about $1,000 over a 21-month period from the minor child's father. Through a work-release program, the father found a job while still incarcerated, and he generally remained employed after his release from jail. He testified, however, that he was unable to pay more child support because he "was just getting on [his] feet."[2] The mother also testified that she had incurred a large medical bill because the minor child had to have tubes placed in his ears and that the father had made no attempt to help her pay for their child's health care or to provide him with health insurance.
The mother testified that in September 1998 she was working from 10 p.m. until 6 a.m. She testified that she had made several attempts to get on a day shift so she could be with her children at night. However, she said, work assignments were determined by seniority and she had not been with her employer long enough to get a day shift.[3]
On the nights when the mother had to work, the minor child and his stepsister would spend the night with the child's maternal aunt. The aunt lived within eyesight of the mother's mobile home. The minor child and his stepsister went to the maternal aunt's house at dark to get ready for bed, and the mother would walk over to the house before leaving for work to tell them good night. On nights when the two children did not go to their maternal aunt's house, their 17-year-old cousin came to the mobile home and stayed with them. Other relatives lived nearby and from time to time they would stay with the children.
The father testified he had suspicions that the mother had been leaving her children alone while she worked and that around September 1, 1998, he and his mother went to the mother's mobile home to express their concerns. The father further testified that around the same time he began talking with his lawyer about getting custody of the minor child and getting a restraining order against the mother.
On September 9, 1998, the mother had a cold and could not work that night as scheduled. The mother told her daughter that she was going to see a doctor and instructed her to take the minor child to the maternal aunt's house when it got dark. She told her daughter that she would return home as soon as possible. The mother obtained permission from her *1273 supervisor to miss work, and then she and a friend went to the emergency room in Haleyville. The mother remained in the emergency room until about 12:30 a.m. and returned home around 1:30 a.m. When she arrived home, the mother learned that the father had come to her house while she was away and had taken the child. The mother immediately telephoned the father to ask about the child.
The minor child's stepsister testified that she and her brother were watching television when their mother left for the doctor and that they fell asleep. The children woke up between 9:30 and 10:30 p.m., but because it was late they did not go to their maternal aunt's house as their mother had instructed them to do. Some time later, the stepsister heard a banging at the door that continued for some time. She did not know who might be at the door and did not answer it. About 15 minutes later, she heard someone knocking on the door again. This time the stepsister also heard her maternal aunt's voice and answered the door. The stepsister testified that the minor child's father took the boy and left the mobile home. The father did not ask where the child's mother was or when she was expected back home. Both the stepsister and the maternal aunt testified that the mother had never left the children alone before that night.
The father married in April 1998. His wife has three children from another marriage. The minor child shares a bedroom with his 7- and 10-year-old stepsisters. The father testified that he was employed at a warehouse facility in an adjoining county, that he worked from 3:30 p.m. until 2 a.m., and that he arrived home around 3 a.m. He testified that his wife generally worked from 8:30 a.m. until 7 p.m. and that her commute home is about 45 minutes. She occasionally attends AA meetings, and when she does, she does not arrive home before 9 p.m. The father testified that the minor child attends a daycare facility on weekdays.
The mother argues that the father did not present sufficient evidence to satisfy the standard for custody modification established in Ex parte McLendon, 455 So.2d 863 (Ala.1984), and that the trial court abused its discretion in failing to follow the guidelines for custody modification set forth in McLendon. The father did not favor this court with a brief.
"When there is a prior custody order, the party seeking to modify that order must show a material change in circumstances has occurred since the last order, which warrants a change in custody. The petitioner must also show that the change in custody will materially promote the child's best interests, and that the benefits of the change will more than offset the inherently disruptive effect caused by uprooting the child. Ex parte McLendon, 455 So.2d 863 (Ala.1984). The burden of proof placed upon a non-custodial parent seeking to modify a prior custody order to change custody is a heavy burden. Hermsmeier [v. McCoy, 591 So.2d 508 (Ala.Civ.App.1991)], and Mashburn v. Mashburn, 555 So.2d 1123 (Ala.Civ.App.1989)."
Galloway v. Harris, 646 So.2d 100, 101 (Ala.Civ.App.1994).
In the present case, the burden of meeting the McLendon standard remained with the father even though he had temporary custody of the minor child at the time of the final hearing. The maternal aunt testified that the mother had never left the children alone before. The maternal aunt said that she pleaded with the father not to take the minor child.
"`[A] pendente lite order, whether entered ex parte or after notice and hearing, clearly envisions a temporary disposition of custody pending a later final determination of the custody dispute.' Sims v. Sims, 515 So.2d 1, 2 (Ala.Civ. App.1987).... `It is well settled that a pendente lite order changing custody does not shift the burden of meeting the McLendon standard to the parent who temporarily loses custody by virtue of *1274 that order. See T.L.L. v. T.F.L., Jr., 580 So.2d 1359 (Ala.Civ.App.1991); Sims v. Sims, 515 So.2d 1 (Ala.Civ.App.1987).' D.P.M. v. D.B., 669 So.2d 191, 194 (Ala. Civ.App.1995)."
C.M.L. v. L.S.M., 680 So.2d 375, 377 (Ala. Civ.App.1996) (emphasis added).
"The courts of Alabama have emphasized that a change of custody from one parent to another is not a decision to be made lightly; on the contrary, it may be made only where the evidence discloses an obvious and overwhelming necessity for change." Ex parte Peppers, 703 So.2d 299, 302 (Ala.1997) (citation omitted). See also Whitfield v. Whitfield, 570 So.2d 700, 702 (Ala.Civ.App.1990). In child-custody cases, when evidence is presented ore tenus, the judgment of the trial court is presumed correct, and that judgment will not be reversed absent an abuse of discretion or a showing that the judgment is palpably wrong. Hermsmeier v. McCoy, 591 So.2d 508 (Ala.Civ.App.1991); Matter of Young, 456 So.2d 823 (Ala.Civ.App.1984). However, even under the ore tenus rule, "[w]here the conclusion of the trial court is so opposed to the weight of the evidence that the variable factor of witness demeanor could not reasonably substantiate it, then the conclusion is clearly erroneous and must be reversed." Jacoby v. Bell, 370 So.2d 278, 280 (Ala.1979). See also, P.A.T v. K.T.G., [Ms. 2971108, February 26, 1999] ___ So.2d ___, ___ (Ala.Civ.App. 1999).
We agree that the minor child's father did not prove either that the custody change would materially promote the minor child's best interests or that the good brought about by the change would offset the "inherently disruptive effect" of the change. Thus, the father failed to satisfy either of the requirements of McLendon, and he was not entitled to custody of the minor child.
On the one hand, the father's testimony regarding his work schedule and the work schedule of his wife indicated that the minor child would have little contact with either during the week and would compete with three other children for their attention on the weekend. On the other hand, if custody of the minor child were returned to the mother, he would spend most of every weekday and all of the weekend with the mother, his stepsister, and their extended family. Furthermore, the mother had been the minor child's primary custodian for two years, and the father's own testimony indicates that the minor child had a close relationship with his stepsister.
Although the father testified that he found marijuana in the ashtray of the mother's car in November 1997, we have only his self-serving testimony to indicate that this event actually took place or that the mother has abused drugs. The father testified that the car was in his mother's driveway at the time and that he took some of the marijuana and put it in a small plastic bag. The father gave no explanation for leaving the rest of the marijuana in the mother's car, or for making no attempt to inform the police, the court, or the Department of Human Resources of his discovery. Although the father testified that he showed the marijuana to his mother, his mother did not mention this incident in her testimony.
At trial, the father asserted that his claim that the mother was using drugs again is somehow supported by the fact that the mother's home furnishings were repossessed. We believe, however, that the fact of the missing home furnishings evidences nothing more than the hardships the mother endured while rearing two children with almost no financial assistance from their fathers. We note that, except for the father and his mother, every witness, including the court referral officer responsible for testing the mother, testified that the mother did not appear to have been using drugs. In fact, the record discloses that the mother was given a drug test the day after the father filed his petition and that she passed that test.
*1275 We also hold that the trial court's order fails to consider the custody guidelines established by McLendon. Indeed, the trial court's final order shows that the only matter considered by the court was the mother's alleged failure to comply with the court's order regarding drug screens. However, the record evidence shows that the mother complied with the court referral officer's color code program and that she passed every drug screen.
Accordingly, the trial court's judgment is reversed and this cause is remanded for proceedings consistent with this opinion.
The mother requests an attorney fee for representation on appeal. That request is granted, in the amount of $1,000.
The foregoing opinion was prepared by Sam A. Beatty, Retired Justice, Supreme Court of Alabama, while serving on active-duty status as a judge of this court under the provisions of § 12-18-10(e), Ala.Code 1975.
REVERSED AND REMANDED.
All the judges concur.
NOTES
[1] There is some confusion as to the conditions of the mother's drug screens, particularly as they pertain to frequency of testing. The record includes an order entitled "Order Pending Final Hearing," dated September 19, 1996. This order bears the signature of the father's sister and originated with the 1996 custody case. Under this order, the mother was required to be tested for drugs weekly.

It appears from the record that the order now in place was entered by the trial court on or about November 14, 1996, and was read into the record by the mother's attorney. This order provides that the mother "shall continue in the color code testing program until the court referral officer recommends that she should be discharged from participation therein."
Under the color code program, the mother had to take a drug screen only when her color came up, a purely random event. Thus, it would be entirely possible for the mother to be in full compliance with the color code program, even if she was not tested every week.
[2] The record contains no order requiring the father to pay support for the minor child. However, the home study conducted on the father states that the father was obliged to pay $160 per month for the minor child while the child was in the mother's custody.
[3] Subsequent to the September 9, 1998, incident, the mother left her previous employer and took a job that allowed her to work on from 8:00 a.m. to 5 p.m. on weekdays.